Flank *v.* Walker, Appellant.

. Argued November 10, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

*Harold M. Kominars,* with him *Henry Temin* and *Max E. Cohen,* for defendant, appellant.

*Arthur M. Harrison,* with him *Bernstein & Bernstein,* for plaintiffs, appellees.

*Richard J. van Roden,* with him *Pepper, Bodine, Frick, Scheetz & Hamilton,* for additional defendant, appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 18, 1960:

On February 19, 1956, in Philadelphia, Howard M. Flank, a child two years of age, was seriously injured when the car in which he was riding with his father, mother and sister, collided with a car owned and operated by Walter Walker. His father, Bernard Flank, driving westwardly on Girard Avenue, had stopped for a red light at the 40th Street intersection and when the light changed to green, he thrust his left arm out the window to signal his intention of turning to the left into 40th Street. He noted an automobile travelling eastwardly on Girard Avenue some 150 to 175 feet away and, assuming he had "plenty of time" to negotiate the turn before the arrival of the distant car, he accordingly made the turn and proceeded south on 40th Street. However, when he reached a point a "couple of feet" away from the curb line on the south side of Girard Avenue, he was struck by the Walker car. Howard Flank suffered serious injuries and, through his parents, brought suit against Walter Walker who brought in Bernard Flank as additional defendant. The jury returned a verdict in favor of the child in the sum of $10,000 and in favor of the parents in the sum of

$926.15. It absolved Bernard Flank as additional defendant.

The defendant appeals, asking that the judgment in favor of the Flank parents be reversed on the basis that Bernard Flank was negligent and that a new trial be awarded in the boy's case on the basis that the verdict was excessive.

The defendant says in his brief filed in this Court: "The additional defendant [Bernard Flank] patently violated the duty of care required by a motorist in making a left hand turn, to observe the approach of other cars across whose path the turning car will go. The duty of care requires the giving of a signal (the type of signal that gives adequate notice to the car coming in the opposite direction, whether it be by hand signal or by left turn lights) and an observation by the left turning vehicle immediately prior to crossing the path of the oncoming car."

But Bernard Flank did all these things which the defendant enumerates. He observed the approach of the car, he gave a signal and he made an observation prior to making the turn. The defendant uses the phrase "immediately prior to crossing the path of the oncoming car." Obviously this kind of an observation, unless preceded by an anticipatory look, can not avert an impending collision. If a motorist does not look until just before he crosses the path of the oncoming car it may be too late for him to do anything to prevent an impact with that car. Moreover, the turning motorist has a responsibility toward cars and persons directly ahead of him. If, as in this case, a motorist sees another car 150 to 175 feet away traveling at the rate of 20 to 25 miles per hour, and the motorist gives a signal that he is about to turn, it cannot be said as a matter of law that in proceeding directly ahead after making the turn, his act is a negligent one. At the

most it would be a question for the jury to determine whether he committed an act of negligence.

The defendant also argues that Flank did not prove that the defendant Walker saw the hand signal made by Flank, but this is captious argumentation. If Walker was attending to his responsibilities at the wheel of his car, and his eyesight was normal, he could not help but see Mr. Flank's extended arm. However, if the defendant intends to argue that he was too far away (150 to 175 feet) to see the signal, then certainly he was not so close as to charge Flank with negligence in making his projected turn and going on his way.

The defendant argues: "Nor can plaintiff in this case rest secure upon any assumption that defendant Walker would stop upon seeing the left turning vehicle."

If the mere suggestion of a tire on the horizon is to instil apprehension and fear into all others using the highway all automobile traffic will freeze to a standstill. As in all other phases of human relationship, the element of reasonableness must control. It is for the jury to decide whether one turning into an intersection when he sees another automobile 175 feet away, travelling at 20 miles an hour, commits the act of an unreasonable and imprudent person. The jury is peculiarly equipped to decide such a question, and it has decided that question in this case in a manner which admits of no charge of capricious or wilful disregard of reality, logic, or law. We see no reason to disturb the verdict which found Walker guilty of negligence and which exculpated Bernard Flank from that charge.

The violence of the collision between the two vehicles inflicted on the two-year-old Howard M. Flank a fracture of the left femur "with gross displacement of bone." The femur, of course, is the largest bone in the body, extending from the hip to the knee. At the hos-

pital, to which the child was taken after the accident, he was placed in traction with both legs uplifted at right angles to his body. He remained in this painful position from February 19th to March 14th. Three days later he was put into a cast covering his body from chest to toes. This cast not proving satisfactory it was removed after two or three days and he was placed in another body cast on March 31st, this one enduring until April 24th. After 41 days at the hospital, the child was taken home but he was brought back to the hospital for follow-up care in the summer of 1956 and in December, 1956 and May, 1957.

It was not until December, 1956, that Howard could walk and run without difficulty. Even so, as late as October, 1958, his leg still manifested evidence of the bone breakage. His doctor testified: "I think that the limb is not as fully strong now as its opposite member and it cannot take the punishment and the fatigue that a normal limb can." The boy's mother told the doctor that "when he became fatigued or tired, he reverted back to the limp."

In August, 1957, the doctor found: "At this time there was some mild limp and ache due to excessive activity." The doctor also expressed the recommendation that the child should be examined every year. It was testified that at the time the boy was in a cast and in traction he suffered excruciating pain and it cannot be doubted that extreme pain and inconvenience would be an inevitable concomitant of the rigorous treatment to which the child was subjected. The boy has not yet completely readjusted. The emotional disturbance caused by the accident and the bone breakage makes him restless in his sleep and has engrafted into him a fear of riding in automobiles.

As already stated, the jury returned in his favor a verdict of $10,000. The defendant urges that this amount is so excessive that a new trial must be ordered.

However, before a new trial may be awarded on the basis of an excessive verdict, the verdict must be one which shocks the conscience of the court. In the endeavor to meet this criterion of shockability, the defendant calls to our attention the case of *Mansfield v. Philadelphia*, 352 Pa. 199, where (a leg fracture also being involved) a jury verdict of $10,000 was reduced to $6,000. He refers also to the case of *O'Hara v. Scranton*, 342 Pa. 137 (another leg fracture) where a verdict of $7,000 was reduced to $5,600.

Physiological reactions vary so greatly in different people that it is useless to attempt to establish a standard of monetary compensation for disablement, pain, and suffering, by considering various verdicts in unrelated cases. But, even if the leg fracture in the *Mansfield* case were to be equated with the gravity of the leg fracture in the case at hand, it must be noted that fifteen years have passed since the *Mansfield* verdict. In that time the American dollar has suffered so many fractures of femur and tibia that, according to physicians in finance, it can limp along at only 52% of the speed it displayed in 1942. Every item that can be imagined costs more today than it did when the *Mansfield* decision was rendered. Among those items are legs, and the person who negligently breaks one belonging to another must pay the increased price just as he must pay the augmentation noted on every price tag found in every mart where money is the language of exchange.

Judgment affirmed.